**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **KIMBERLY PRITCHETT,** § | |
| Plaintiff, § | |
| § | |
| v. § | No. 3:11-CV-00309-BF |
| § | |
| **COMMISSIONER OF THE** § | |
| **SOCIAL SECURITY ADMINISTRATION,** § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

This is an appeal from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying the claim of Kimberly Pritchett ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. The Court considered Plaintiff's Brief, filed on October 7, 2011, Defendant's Brief, filed on November 7, 2011, and Plaintiff's Reply Brief, filed on November 22, 2011. The Court reviewed the record in connection with the pleadings. For the following reasons, the final decision of the Commissioner is **REVERSED** and **REMANDED**.

### **Background**[1]

**Procedural History**

Plaintiff filed applications for benefits under Titles II and XVI of the Act on June 12, 2007, alleging a disability onset date of December 1, 2006. (Tr. 149-155.) Plaintiff claimed disability because of her diabetes, high blood pressure, and a mental impairment due to limited education. (Tr. 195, 209, 222.) A hearing was held before an Administrative Law Judge ("ALJ") on February 10, 2009. (Tr. 28-52.) At the hearing, Plaintiff, who was represented by counsel, a medical expert

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

("ME"), and a vocational expert ("VE") testified. (*Id*.) Plaintiff was 37 years old on the date of the hearing. (Tr. 31.) The ALJ issued an unfavorable decision on May 1, 2009, finding that Plaintiff was not disabled. (Tr. 18-27.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council. (Tr. 13.) On December 20, 2010, the Appeals Council denied Plaintiff's request for review. (Tr. 1-6.) Thus, the ALJ's decision became the final decision of the Commissioner, from which Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

**Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on September 24, 1974, and she was 35 years old on her alleged onset date. (Tr. 53, 149, 26.) She has a third grade education, and was found to be illiterate by the ALJ. (Tr. 199, 26.) Plaintiff was removed from school by her parents after the third grade, and she was home-schooled for less than a year. (*Id*.)

Plaintiff worked for various employers, but she primarily worked in the fast food industry and as a shuttle driver. (Tr. 47.) Plaintiff listed a number of jobs held in the past, but very few produced significant earnings. (Tr. 201, 169-186.) Some of those jobs lasted over three months, but some of them did not. (Tr. 32.) In both of Plaintiff's primary jobs, as a shuttle driver and as a pizza delivery driver, Plaintiff needed additional help to complete necessary job tasks. (Tr. 35-36, 40.) Plaintiff worked as a shuttle driver for approximately three years, but only worked for Domino's for less than three months. (Tr. 32.)

**Plaintiff's Medical Evidence**

Plaintiff is a morbidly obese woman who physically suffers from degenerative joint disease of her knees, diabetes mellitus, obesity, and insomnia. (Tr. 311.) She mentally suffers from borderline intellectual functioning and major depression. (Tr. 455.) Plaintiff has always been overweight and medical records show she has weighed as much as 383 pounds, but has never been less than 344 pounds. (Tr. 294, 496.) Her Body Mass Index ("BMI") is in the range of 53.4 to 48.0, based on a recorded height of 5' 11". (Tr. 294.)

Plaintiff first learned she had diabetes mellitus after she went to the emergency room on June 7, 2007, complaining of vomiting and diarrhea. (Tr. 282.) Test results showed her blood sugars at 314. (Tr. 287.) After she was released from the hospital, Plaintiff sought treatment at Kaufman Community Health Center ("Kaufman"). (Tr. 293.)

Most of the initial care at Kaufman focused on weight reduction, compliance with medications, and control of her blood sugar levels and high blood pressure. (Tr. 294, 297, 299, 300, 304.) By October of 2007, Plaintiff had lost 30 pounds, but she complained of back and leg pain. (Tr. 327.) She reported working and being on her feet more, and this caused pain in her knees. (*Id.*) In February 2008, she continued to complain of experiencing shooting pains in her back and knees. (Tr. 349, 436.) At her visit in September 2008, she again complained of pain in her back and knees, but also stated she had numbness in both of her thighs. (Tr. 435.) The doctor indicated she needed to have x-rays taken, but Plaintiff could not afford them. (Tr. 435.) In February 2009, Plaintiff was prescribed Lortab for her knee pain. (Tr. 496.) A couple months later, in April, the dosage of Lortab was increased from 5 mg to 7.5 mg to better help manage her pain. (Tr. 495.)

At the end of 2008, Plaintiff again went to the emergency room, complaining of feeling faint, dizzy, nauseous, and hearing loss in her right ear. (Tr. 465, 462.) She also complained of back and leg pain, and rated that pain at 10/10 with numbness. (Tr. 462, 465.) Plaintiff made another trip to the emergency room, after the hearing before the ALJ, complaining of the same types of pain. (Tr. 503.) Imaging studies revealed degenerative changes, disc narrowing, and an old compression fracture. (Tr. 507.) A CT Scan showed a herniated and extruded disc fragment and measured the compression fracture at 15% loss of disc height. (Tr. 508.)

At the request of the Commissioner, Plaintiff was sent to Dr. Harold Nachimson on November 29, 2007 for a physical consultative examination. (Tr. 308.) The doctor noted bilateral knee problems related to her weight and low back problems. (Tr. 309.) The doctor's clinical impression was hypertension by history, Type II diabetes, morbid obesity, insomnia, possible sleep apnea, and degenerative joint arthritis of the knees. (Tr. 311.) Regarding Plaintiff's daily activities, the doctor noted that her self-care is unrestricted, she drives a car, she shops and pushes a cart, she can walk about a mile, and she does some cooking and housework. (Tr. 308-09.)

Plaintiff was also sent to Dr. Deborah Whitehead Gleaves, at the request of the Commissioner, for a psychiatric consultative examination. (Tr. 450.) The examination took place on October 9, 2008, wherein Plaintiff's IQ and mental status were evaluated. (*Id.*) The doctor initially noted that Plaintiff's boyfriend drove her to the examination, read the pre-interview questionnaire to her, and then filled out the answers for her. (Tr. 450.) Dr. Gleaves noted that Plaintiff was morbidly obese, seemed depressed, and was embarrassed by her inability to read and write. (Tr. 450-51.) Regarding Plaintiff's daily activities, the doctor made notations that Plaintiff lives with her boyfriend who does the meal preparation, grocery shopping, finances, and along with her daughter, all the housekeeping.

4

(Tr. 451.) Plaintiff is able to do "basic activities of daily living"; make a sandwich and use the microwave; use a telephone and a cell phone; and with effort, she can count money and tell time. (*Id.*) The doctor noted that Plaintiff no longer drives due to her blackouts. (*Id.*)

Dr. Gleaves administered three tests to Plaintiff: the Wechsler Adult Intelligence Scale -3 ("WAIS-3"); the Wide Range Achievement Test -3 ("WRAT-3"); and the Minnesota Multiphasic Personality Inventory -2 ("MMPI-2"). (Tr. 453.) The doctor noted that Plaintiff put forth good effort on the WAIS-3 test. (Tr. 454.) The test results for the WAIS-3 revealed a full scale IQ score of 66, a verbal IQ score of 70, and a performance IQ score of 67. (*Id.*) These IQ scores placed Plaintiff in the mild mental retardation range of intellectual functioning. (*Id.*) The WRAT-3 tested Plaintiff's reading, spelling, and arithmetic, and in all three categories, Plaintiff tested at the third grade level. (*Id.*) The MMPI-2 was found to be valid and reflected significant depression and anxiety. (*Id.*) Dr. Gleaves diagnosed Plaintiff with major depressive disorder, recurrent, severe and without psychotic features; and borderline intellectual functioning. (Tr. 455.) She was assigned a Global Assessment of Functioning ("GAF") score of 60.[2]

**Plaintiff's Testimony at the Hearing**

Plaintiff testified on her own behalf at the hearing held on February 10, 2009. Plaintiff was represented by counsel at the hearing, and her fiancé, Calvin Poole, was also present at the hearing. Plaintiff testified that she is thirty-seven years old and she has three children. (Tr. 31.) She stated that only one of her children still lives with her, and that child is nineteen years old. (*Id.*) Plaintiff testified that she only reached the third grade in school and that she is not able to read and write

---

[2] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See id..*

much. (Tr. 31-32.) Plaintiff stated that her parents took her out of school for religious reasons and home-schooled her for less than a year. (Tr. 37.) She testified that she was married and had her first child at the age of fourteen years. (Tr. 38.)

Plaintiff then spoke about her past work experience as a shuttle driver and a delivery driver for Domino's. (Tr. 32.) She testified that her only other work experience in the last fifteen years was in the fast food industry. (*Id.*) She stated that some jobs lasted over three months and some did not. (*Id.*) Regarding her position as a shuttle driver, Plaintiff explained that the administrator went on the route with her the first few times. (Tr. 35.) She testified that she then became familiar with the route, and drove the same route with the same people almost every day. (*Id.*) Plaintiff stated that if the route changed or she had a new person on the route, the administrator would come along to show her the way. (Tr. 36.) She testified that she had trouble with her job at Domino's because she couldn't read and write so it was hard for her to find addresses and take orders on the phone. (Tr. 39.) She stated that her fiancé worked at Domino's too and he helped her get the job. (*Id.*) She testified that he did all of her paperwork for her and basically everything else except make the pizzas. (Tr. 40.)

Plaintiff testified regarding her medical issues with arthritis and diabetes. (Tr. 33.) She stated that her diabetes has caused her to have a seizure, chest pains, and high blood pressure. (Tr. 33, 37.) She testified that she weighs about 380 pounds and that she has weighed this amount all of her life, except for a couple months when she lost weight and weighed 360 pounds. (Tr. 31, 39.)

**The Hearing**

An ME and a VE were also present at the hearing and provided testimony. The ME, Dr. Smith, testified regarding Plaintiff's mental impairments, identified by Dr. Gleaves. (Tr. 41.) He stated that she was identified as having some depression issues and a limited education. (Tr. 42.)

The ME testified that Plaintiff scored in the low range on the WAIS-3, 66 to 70. (*Id.*) He stated her achievement scores were at the third-grade level and her test scores were in the mental retardation range. (*Id.*) However, he did state that Dr. Gleaves estimated Plaintiff's intelligence to be borderline to low average, and she was diagnosed with borderline intellectual functioning. (*Id.*) The ME stated that Dr. Gleaves also diagnosed Plaintiff with major depression, but he didn't see a history of depression in Plaintiff's medical records. (*Id.*) The ME noted that Plaintiff was able to obtain a commercial driver's license and that she drove an eighteen wheeler for a while. (Tr. 43.) The ME testified that in summation, Plaintiff's mental impairments included major depressive disorder and borderline intellectual functioning. (*Id.*)

The ALJ then asked the ME to consider the B criteria for 12.04, Affective Disorders. (*Id.*) The ME testified that Plaintiff had moderate limitations in activities of daily living; mild limitations in social functioning; moderate restrictions on concentration, persistence, and pace; and no episodes of decompensation. (*Id.*) The ME testified that in his opinion, Plaintiff's impairments did not meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) He also stated that Plaintiff would not need special supervision at work, but she would be unable to perform tasks that required academic skills, such as reading, writing, calculations, or calculating requirements. (Tr. 43-44.)

On cross-examination by Plaintiff's counsel, the ME testified that on the MMPI-2, Plaintiff's scale was elevated for major depression, indicating serious or severe symptoms. (Tr. 44.) The ME also testified that Plaintiff's IQ scores were described as being valid and that she put forth good effort. (Tr. 44-45.) The ME also stated that Plaintiff's IQ scores met one prong of

the 12.05 listing. (Tr. 45.) However, the ME would not agree with Plaintiff's counsel that it was clear that these IQ scores manifested before she reached the age of 22. (*Id.*)

Next, the VE, Ms. Donaldson, testified regarding Plaintiff's past work and jobs in the national economy. The VE stated that Plaintiff has been a fast food worker, classified as light, SVP of two, and a shuttle bus driver, classified as medium, SVP of three. (Tr. 47.) The ALJ posed a hypothetical to the VE: assume someone at a sedentary level of physical capacity, which means they can only lift ten pounds occasionally and less than ten pounds frequently, can stand or walk for two hours in an eight hour day, and sit for six hours in an eight hour day; no climbing, no ladders, no scaffolds, and no crawling; has the capacity to understand, carry out, and remember only short and simple one-two step tasks and instructions; and no reading and no math. (Tr. 47-48.) The VE testified that assuming that hypothetical, a person would not be capable of performing Plaintiff's past relevant work. (Tr. 48.) The VE did testify, however, that a person with that residual functional capacity ("RFC") and of Plaintiff's same age, education, and experience would be capable of performing other jobs existing in significant numbers in the national economy. (*Id.*) These jobs include an optical final assembler, classified as sedentary, SVP of two; an optical lens inserter, classified as sedentary, SVP of two; and a table worker, classified as sedentary, SVP of two. (Tr. 48-49.) The VE stated her testimony did not conflict with the Dictionary of Occupational Titles ("DOT"). (Tr. 50.)

**The Decision**

The ALJ analyzed Plaintiff's claim pursuant to the five-step sequential evaluation process.[3] At step one, the ALJ determined that Plaintiff's work activity after her alleged onset date did not rise to the level of substantial gainful activity. (Tr. 20.) At step two, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus, obesity, and borderline intellectual functioning. (*Id.*) At step three, the ALJ determined that Plaintiff's combined impairments did not meet or equal any of the listed impairments for presumptive disability under the Social Security regulations. (Tr. 23.)

Before proceeding to step four, the ALJ assessed Plaintiff's RFC. He found that she retained the ability to perform sedentary work, including the ability to lift and carry a maximum of 10 pounds occasionally and less than 10 pounds frequently, stand and walk for about two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (*Id.*) The ALJ further limited Plaintiff to avoid ropes, climbing, scaffolds, and any work involving math, writing, or reading requirements. (*Id.*) The ALJ also determined that Plaintiff had the ability to understand, carry out, and remember short and simple tasks and instructions. (*Id.*)

At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work. (Tr. 26.) At step five, the ALJ found, based on the testimony of the VE, that Plaintiff could perform other work that existed in significant numbers in the national economy, including final assembler,

---

[3] (1) Is the claimant currently working? (2) Does she have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent her from performing her past relevant work? (5) Does the impairment prevent her from doing any other work? 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

lens inserter, and table worker positions. (Tr. 26-27.) Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. 27.)

## Standard of Review

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability.

*Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference.  *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g).  Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564.  The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

## Issues

1. Whether the ALJ failed to apply the appropriate legal standard at Step 3 in ruling that Plaintiff's impairments do not meet or equal Listing 12.05C;

2. Whether the RFC is supported by substantial evidence; and

3. Whether Plaintiff was prejudiced at Step 5.

## Analysis

**Listing 12.05 - Mental Retardation**

Plaintiff argues that the ALJ erred because even though he stated he considered Listing 12.05, he failed to engage in an evaluation of 12.05C, the section actually applicable to Plaintiff's impairment. Instead, the ALJ evaluated Plaintiff's impairment by analyzing the B and C criteria applicable only to Listings 12.02 (Organic Mental), 12.03 (Schizophrenia), 12.04 (Affective), and 12.06 (Anxiety). The Commissioner concedes the ALJ did not provide a specific 12.05C analysis but argues this failure was harmless error. In support of his argument, the Commissioner cites to *Audler v. Astrue,* which held that an ALJ's failure to consider a specific listing can be harmless error if it appears from the record that such listing is not met. 501 F.3d 446, 448 (5th Cir. 2007).

In order to meet Listing 12.05C, a claimant must establish three criteria:

(1) significant subaverage intellectual functioning with deficits in adaptive functioning which initially manifested before age 22; and

(2) a valid I.Q. score of 60 to 70; and

(3) a physical or other mental impairment posing additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. The Commissioner does not contest whether Plaintiff meets the second and third requirements, but he does contend that there is no evidence in the record demonstrating Plaintiff has significant subaverage intellectual functioning with deficits in adaptive functioning which manifested before the age of 22. The Commissioner's argument is without merit.

The record clearly shows Plaintiff's academic deficits, as she only completed the third grade in school, was home-schooled for less than a year, and scored at the third grade level on all three portions of the WRAT-3. Plaintiff testified that she cannot read and write much, and the ALJ found her to be illiterate. Moreover, evidence in the record could support a finding of deficits in adaptive functioning.[4] At the age of fourteen, Plaintiff moved out of her parents house to marry an older, abusive man, and she became pregnant. Plaintiff testified that she has weighed 380 pounds all of her life, except for a few months where she weighed 360 pounds. Plaintiff has worked primarily in the fast food industry and as a shuttle driver. Plaintiff testified that she required supervision and assistance in her past work as a shuttle driver and delivery driver at Domino's. Plaintiff testified that her boyfriend got her hired at Domino's, and he completed all of her paperwork and other work besides making the pizzas. Plaintiff told Dr. Gleaves that she was originally hired at Domino's to be a manager, but she was demoted because she was unable to read and fill out the paperwork. She worked at Domino's for approximately three months, but could no longer drive due to her blackouts.

Regarding her current "adaptive activities", Plaintiff indicated to Dr. Gleaves that she lives with her boyfriend, Calvin Pool, who does all of the cooking, grocery shopping, finances, and along

---

[4] "Adaptive activities" include: cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and using a post office. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C(1). The regulations state: "[i]n the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction. *Id.*

with her daughter, household maintenance. Dr. Gleaves noted that her boyfriend drove her to the examination, read the pre-interview questionnaire to her, and filled in the answers for her. Similarly, the handwritten forms to Social Security were completed by Calvin Pool rather than by Plaintiff. (*See* Tr. 208, 211.) Plaintiff advised Dr. Gleaves that she does not currently drive.

The Commissioner raises several arguments wherein he points to other evidence in the record which suggests that Plaintiff is capable of performing some "adaptive activities". However, the Commissioner's post-hoc arguments cannot remedy the ALJ's failure to support his decision with substantial evidence. *See Newton v. Apfel*, 209 F.3d 448, 454 (5th Cir. 2000) (holding that the decision "must stand or fall within the reasons set forth in the ALJ's decision"). Furthermore, when the ALJ incorrectly analyzed the B criteria for Listings 12.02-12.04 and 12.06, he found that Plaintiff's intellectual functioning caused a moderate effect on her ability to perform daily activities. (Tr. 23.) Thus, it is apparent that the ALJ at least recognized some deficits in Plaintiff's adaptive functioning, notwithstanding his failure to analyze 12.05C. It is not for this Court to speculate as to how the ALJ would find on this matter. *See Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

The Commissioner also contends that Plaintiff has not demonstrated significant subaverage intellectual functioning that manifested prior to age 22 because Plaintiff was 37 years old when her IQ was tested. The Fifth Circuit has not directly addressed this issue in a social security case, but it has considered the issue in other contexts. *See Morris v. Dretke*, 413 F.3d 484, 487 (5th Cir.2005) (considering defendant's I.Q. scores obtained after he turned 18 when analyzing whether defendant's significant subaverage intellectual functioning manifested before 18). Moreover, the United States District Court for the Southern District of Texas has addressed this issue and held that the lack of an IQ score during the developmental period would not preclude a finding of plaintiff's significant

14

subaverage intellectual functioning for mental retardation. *See Durden v. Astrue,* 586 F.Supp.2d. 828, 833 (S.D. Tex. 2008).

Additionally, other circuits have considered this issue and found that a low IQ score creates a rebuttable presumption of manifestation before the age of 22. *See Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir.1985) ( "[T]here may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life. The fact that one was not earlier taken does not preclude a finding of earlier retardation."); *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir.2001) ("[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning); *Guzman v. Bowen*, 801 F.2d 273, 275-76 (7th Cir.1986) (adopting the Fourth Circuit rule of rebuttable presumption of constant IQ); *Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001) (finding that there is a presumption "that IQ's remain fairly constant throughout life"). The Southern District of Texas discussed the presumption in these cases and found the reasoning to be persuasive. *See Miller v. Astrue,* No. 4-07-CV-2611, 2008 WL 8053474 at *3 n.1 (S.D. Tex. Sep. 8, 2008). Furthermore, the Northern District of Texas has adopted this rule in *Helton v. Astrue,* stating that there is a "generally accepted principle that, absent brain injury, mental retardation is a life-long impairment." No. 2-08-CV-0079-J, 2011 WL 1743409 at *4, (N.D. Tex. Apr. 22, 2011), *rec. adopted* 2011 WL 1752243 (N.D. Tex. May 6, 2011). *See also Adams v. Astrue,* No. 4-10-CV-0216-BD, 2011 WL 2550772 at *3 (N.D. Tex. June 27, 2011) (explaining that there is a significant body of case law which holds that there is a presumption that IQ scores remain stable over time, and thus, a claimant need not produce an IQ score obtained prior to the age of 22 to meet Listing 12.05C).

The Court finds this case law persuasive. Plaintiff scored in the mild mental retardation range of intellectual functioning on the WAIS-3, with a full scale IQ score of 66, a verbal IQ score of 70, and a performance IQ score of 67. The ME testified that those test scores were described as being valid and that Plaintiff put forth good effort. The ALJ did not contest the accuracy of these scores. Further, there was no evidence in the record to demonstrate a change in Plaintiff's intellectual functioning. In fact, Plaintiff scoring at the third grade level on the WRAT-3 only strengthens the presumption that her IQ has remained constant throughout her life considering she only completed the third grade in school.

Because there is evidence that Plaintiff likely has significant subaverage intellectual functioning with deficits in adaptive functioning which manifested before the age of 22, her substantial rights were affected by the ALJ's failure to address Listing 12.05C. *See Audler,* 501 F.3d at 449; *see also Miller,* 2008 WL 8053474 at *8 (remanding case back to the ALJ because the record showed the plaintiff had some deficits in adaptive functioning, and she met the other criteria of Listing 12.05C, but the ALJ failed to explain what standard he used to evaluate Plaintiff's deficits in adaptive functioning). Thus, the Court finds the ALJ committed prejudicial error.

Because we reverse and remand for additional proceedings at step three, we need not reach Plaintiff's additional arguments regarding subsequent steps.

## Conclusion

For the foregoing reasons, the decision of the Commissioner is **REVERSED** and **REMANDED** for reconsideration consistent with this opinion.

SO ORDERED, March 29, 2012.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE